IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PHOENIX LITHOGRAPHING CORP.,  :   CIVIL ACTION
                              :   NO. 12-6960
          Plaintiff,          :
                              :
     v.                       :
                              :
BIND RITE SERVICES, INC.,     :
                              :
          Defendant.          :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    JUNE 24, 2014


**I.   INTRODUCTION**

     Plaintiff Phoenix Lithographing Corporation
("Plaintiff") brings this negligence and breach of bailment
action against Bind-Rite Services, Inc. ("Defendant").
Plaintiff's complaint pleads two counts: (1) Negligence and (2)
Breach of Bailment.  Compl., ECF No. 1.  Plaintiff alleges that
Defendant negligently failed to protect Plaintiff's property, in
Defendant's possession, from Hurricane Sandy, thus causing a
significant monetary loss to Plaintiff.  Defendant's answer
raises several affirmative defenses including the seventh
defense, and subject of the motion sub judice, namely, that
Plaintiff's failure to protect Plaintiff's property was due to

an act of God.[1]  Answer, ECF No. 7.  Thus, this case requires the
Court to determine if the alleged damage caused by Hurricane
Sandy, in this case, falls within the act of God defense, and,
if so, whether Defendant is excused from liability to Plaintiff.

Pending before the Court is Defendant's Motion for
Summary Judgment.  ECF No. 17.  Plaintiff's Reply (ECF No. 18)
has been filed and the motion is ripe for disposition.  For the
reasons that follow, the Court finds that Hurricane Sandy was an
act of God and that Defendant is excused from any damages
resulting in its inability to complete the contract but, due to
a dispute of material fact, not for damages due to the loss of
Plaintiff's approximately 560,000 sheets of printed paper.

---

[1]      The "act of God" defense is now often referred to by
other names, particularly as an "act of nature."  It is beyond
the authority of the Court to settle such theological debates,
and as the parties refer to the defense solely the "act of God"
defense, that nomenclature is used by the Court in this opinion.

## II.  BACKGROUND[2]

On October 16, 2012, Plaintiff, a commercial printing company, entered into an agreement with Defendant, a bindery, to create 750,000 booklets for Plaintiff with each booklet containing twenty-six pages.  Under the agreement, Plaintiff was to print the sheets and deliver them to Defendant's Bergen County warehouse for binding.  Plaintiff was preparing these sheets for a customer of Plaintiff, which Plaintiff alleges is "one of Plaintiff's principal customers."  Pl.'s Resp. 1.  On October 26, at 12:30 p.m. and 2:54 p.m., respectively, Plaintiff delivered two shipments containing approximately 560,000 pages to be bound.

On October 29, 2012, Hurricane Sandy made landfall. U.S. Department of Commerce, Service Assessment, Hurricane/Post-Tropical Cyclone Sandy, October 22-29, 2012, page 1, Ex. C-5. The hurricane's landfall caused a tidal surge.  On October 30, 2012, the "tidal surge pushed up the Hackensack River, causing rapid flooding of the area."  Def.'s Resp. 2.

---

[2]      In accordance with the appropriate standard of review for a motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party.  As Defendant moves for summary judgment, the Court construes the facts in the light most favorable to Plaintiff.

Defendant's facilities, it turns out, were located just 1,500 feet from the Hackensack River and 325 feet from the Losen Slote Creek, a tributary of the Hackensack River which also flooded due to the tidal surge. The Federal Emergency Management Agency ("FEMA") had previously designated Defendant's location as a Special Flood Hazard Area and designated the profile as high-risk for a flood. See Pl.'s Resp., FEMA Report 1, Ex. P-3, ECF No. 18-6.

As a result of the surge, Defendant's facility, a one story brick and cinderblock building, was flooded with "water ris[ing] to a depth of 40 inches," and the "entire premises" was "inundate[d]" with water. Def.'s Mot. Summ. J., Ex. C-1, Ward Aff. 3, Sept. 26, 2013, ECF No. 17-1. The deluge "completely destroyed Plaintiff's printing project, which had been left by Defendant on pallets on the floor of the facility." Pl.'s Resp. 2. Plaintiff alleges that, as a result of the torrent, "Plaintiff was required to reprint approximately 560,000 sheets and engage another vendor to finish the project, resulting in a direct loss to plaintiff of more than $180,000." Pl.'s Resp. 3.

Defendant admits that "other than [that] third shift workers working Monday, the 29th of October, 2012, were sent home early[,] [n]o other preparations were made." Def.'s Mem. Support Mot. Summ. J. 7 (citing Def.'s Resp. Pl.'s Interrog. No. 16). Defendant claims, however, that:

> No other preparations were made as the building, its contents, other assets and business continuity had never been challenged or otherwise meaningfully compromised by a weather event. Defendant was satisfied that its property and property of its customers was secure in a building capable of weathering the approaching storm. The unprecedented and devastating power of the event could not be anticipated.

Def.'s Mem. Support Mot. Summ. J. 7 (citing Def.'s Resp. Pl.'s Interrog. No. 16).

There is no genuine dispute among the parties as to Hurricane Sandy's "monstrous power" and "tremendous size," or that the hurricane was a "tremendously destructive and unprecedented event." Def.'s Mem. Support Mot. Summ. J. 5. Plaintiff disputes Defendant's assertion that it could not have prepared for the storm. Pl.'s Resp. 4 ("Several of these 'uncontested facts,' however, are vigorously disputed by Plaintiff and fall squarely within the purview of the fact finder at trial"). Plaintiff's assertion, therefore, requires the examination of the events leading up to the tempest.

Plaintiff alleges that as early as October 26, 2012, there were "widespread predictions that . . . 'Hurricane Sandy,' was moving towards the eastern seaboard and was expected to make landfall in the coming days in or near the State of New Jersey, bringing with it substantial rainfall, sustained high winds, and inland and coastal flooding." Pl.'s Resp. 1. According to Plaintiff, as early as 4:00 p.m. on October 26, "Bergen County .

. . officials were anticipating 'enough damage for a disaster declaration' and the Governor of New Jersey had ordered reservoirs in northern Bergen County lowered because of the significant danger of flooding."  Pl.'s Resp. 3.

Plaintiff claims that by October 27, 2012, weather forecasters were predicting that "the slow-moving hurricane would merge with a cold weather system . . . and strengthen into a 'super-storm' that would hit the state of New Jersey" with "rainfall of as much as [eight] inches [that] would cause extensive river flooding."  Pl.'s Resp. 2.  On the morning of October 29, 2012, Plaintiff contacted Defendant to inquire as to what impact, if any, the hurricane would have on the project. Plaintiff asserts that Defendant "assured Plaintiff that the storm would likely cause delays of only one or two days in the production of Plaintiff's project."  Later on October 29, at 1:00 p.m., the National Weather Service issued a flood warning for Bergen County.

Plaintiff also directs the court to approximately twenty-six pages of public advisories issued by the National Hurricane Center, several of which discuss Hurricane Sandy's predicted impact on the Garden State.  See Pl.'s Resp., Public Advisories Issued by the National Hurricane Center ("Advisories"), Ex. P-1, ECF No. 18-2.  Plaintiff also asserts that Defendant was aware of the risk of flooding and had

previously decided not to purchase flood insurance "because of
the high premiums charged for such insurance" due to Defendant's
location in a high-risk area for flooding.  Pl.'s Resp. 3
(citing Def.'s Resp. Pl.'s Interrog.).

## III. STANDARD OF REVIEW

        Summary judgment is appropriate if there are no
genuine disputes of material fact and the moving party is
entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).
"A motion for summary judgment will not be defeated by 'the mere
existence' of some disputed facts, but will be denied when there
is a genuine issue of material fact."  Am. Eagle Outfitters v.
Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).
A fact is "material" if proof of its existence or non-existence
might affect the outcome of the litigation, and a dispute is
"genuine" if "the evidence is such that a reasonable jury could
return a verdict for the nonmoving party."  Anderson, 477 U.S.
at 248.

        In undertaking this analysis, the court views the
facts in the light most favorable to the non-moving party.
"After making all reasonable inferences in the nonmoving party's
favor, there is a genuine issue of material fact if a reasonable

jury could find for the nonmoving party." <u>Pignataro v. Port
Auth. of N.Y. & N.J.</u>, 593 F.3d 265, 268 (3d Cir. 2010) (citing
<u>Reliance Ins. Co. v. Moessner</u>, 121 F.3d 895, 900 (3d Cir.
1997)); <u>see also</u> <u>Kelly v. Ziolko</u> 734 A.2d 893, 899 (Pa. Super.
Ct. 1999) (citations omitted).  While the moving party bears the
initial burden of showing the absence of a genuine issue of
material fact, meeting this obligation shifts the burden to the
non-moving party who must "set forth specific facts showing that
there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250.

## IV.  APPLICABLE LAW

Defendant, in its memorandum in support of its motion
for summary judgment, cites to both Pennsylvania and New Jersey
law.  Defendant does not tell the Court why it chooses to cite
both and makes no attempt to determine which law should govern
the underlying action.  Plaintiff, for its part, merely wades
into Defendant's muddied legal analysis and also makes no
attempt to choose the law of either jurisdiction.  Though the
parties dispute the proper legal outcome, neither claims the
result would be different under either Pennsylvania or New
Jersey law.

A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state, which here is Pennsylvania.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Garcia v. Plaza Oldsmobile Ltd., 421 F.3d 216, 219 (3d Cir. 2005); Echols v. Pelullo, 377 F.3d 272, 275 (3d Cir. 2004) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 497 (1941).  Pennsylvania courts apply an interests/contacts approach to choice-of-law issues.  Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc., 94 F. Supp. 2d 589, 594 (E.D. Pa. 1999) ("Pennsylvania adopted a 'flexible rule which permits analysis of the policies and interests underlying the particular issue before the court.'") (quoting Griffith v. United Air Lines, Inc., 203 A.2d 796, 805 (Pa. 1964)).

First, the court must determine whether the states' laws are actually incompatible. Hammersmith v. TIG Ins. Co., 480 F.3d 220, 229-230 (3d Cir. 2007).  "According to conflicts of laws principles, where the laws of the two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict,' and the Court should avoid the choice-of-law question."  Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006).

In this case, were the Court to apply the law of New Jersey or the law of Pennsylvania, the result would be the same because an act of God is an affirmative defense in both

jurisdictions, and the application in both states is done in a nearly identical manner.  See De Cicco v. Marlou Holding Co., 59 A.2d 227 (NJ 1948); Goldberg v. R. Grier Miller & Sons, Inc., 182 A.2d 759 (Pa. 1962).  Accordingly, there is not a true conflict and the Court need not perform Pennsylvania's choice of law analysis.  See Berg Chilling Sys., 435 F.3d at 462. Therefore, the Court applies the law of Pennsylvania as it is the law of the forum in which the Court sits.  See Erie, 304 U.S. at 78.

## V.    ACT OF GOD DEFENSE

Defendant's motion requires the Court to determine if, legally speaking and as applied to the present case, Hurricane Sandy was an act of God.  If the damage caused by Hurricane Sandy was due solely to an act of God, then Defendant cannot be held liable and the Court would grant summary judgment.  If the act of God defense does not apply, either because of a genuine dispute of fact or because of a purely legal inapplicability, then the case would move forward to trial.

The act of God defense to a breach of contract is an antediluvian concept dating back through the millennia.  It was already present in the Roman law that served as a beginning point for European law.  See Layton B. Register, Notes on the History of Commerce and Commercial Law (pt. 1. Antiquity), 7 U.

10

Pa. L. Rev 431, 436 (1913) ("An action was allowed holding the masters of ships, inns and stables responsible for injury to property intrusted [sic] to their guardianship . . . provided that it was not caused by an act of God."). The concept transitioned into the English common law. For instance, in the early seventeenth century, an English court applied the act of God exception to a contract creating a bailment and explained "[i]f the danger accrued only by the act of God, as by tempest, no default being in the [defendant], everyone ought to bear his [own] loss." Mouse's Case, 77 Eng. Rep. 1341 (K.B.), 12 Co. Rep. 63 (1609). Over the centuries that followed, the act of God defense sailed across the Atlantic and lives on in Pennsylvania law. See, e.g., Pollard v. Shaffer, 1 U.S. (1 Dall.) 210, 212 (Pa. 1787) ("On the part of the Defendant, it is insisted, that the express covenant in this case does not bind against acts of God.").

It is well-established that the affirmative defense of act of God is "the concept of a natural force of such inevitability and irresistibleness that man cannot cope with it, either to predict it, forestall it, or control it when it arrives." Engle v. West Penn Power Co., 598 A.2d 290, 300 (Pa. Super. Ct. 1991) (quoting Goldberg, 182 A.2d at 763). An act of God is defined as "an unusual, extraordinary, sudden and unexpected manifestation of the forces of nature which cannot be

prevented by human care, skill or foresight."   Id.   In

determining whether a flood is, or is not, extraordinary the

court should account for the character of the particular stream,

the adjacent territory and the history of previous floods.

Carlson v. A & P Corrugated Box Corporation, 72 A.2d 290, 292

(Pa. 1950); see also Woodbine Auto, Inc. v. Se. Pennsylvania

Transp. Auth., 8 F. Supp. 2d 475, 481 (E.D. Pa. 1998).

> Whether the intervening cause of an injury is wind,
> snow, storm, or sea, the test . . . remains the same:
> Did the defendant do all that a reasonable person
> could have been expected to do to avoid the happening
> which is the cause of the plaintiff's injuries? If he
> did, he is not liable in damages. If he did not, he is
> liable.

Bowman v. Columbia Tel. Co., 179 A.2d 197, 202 (Pa. 1962).

Often the applicability of an act of God exception is

modified or set forth in the agreement between the parties,

generally referred to today as a vis major clause.   In the

present case, neither party provides the court with a copy of a

contractual agreement nor is a written agreement alluded to in

the motion or the response.   Accordingly, the Court's analysis

is limited to the applicability of the defense in the common

law.

The parties both agree that the destruction was caused

by Hurricane Sandy, a natural force, thus satisfying the ancient

precept that the breach be caused by a "manifestation of the

forces of nature."   Engle, 598 A.2d at 300; see also Mouse's

<u>Case</u>, 77 Eng. Rep. 1341.  The parties disagree, however, as to whether or not Defendant could have undertaken some steps to prevent the injury to Plaintiff.  The Court notes that, although Plaintiff lumps its alleged losses together,[3] Plaintiff's alleged injuries can be separated into two groups.[4]  The first group consists of those damages caused by the actual destruction of the approximately 560,000 sheets and costs associated with reproducing them.  The second group includes those damages allegedly associated with having to engage another vendor to finish the project.  For the reasons explained below, Defendant is entitled to summary judgment for the alleged damages relating to the second group, but not to the first.

The act of God exception is an affirmative defense as to which Defendant bears the burden of proof.  Under the Rule 56 paradigm, Defendant must show the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law.  While Defendant has proven that it breached the contract due to a natural force well outside of human control,

---

[3]     "As a direct result of Defendant's recklessness and/or negligence, Plaintiff was required to reprint approximately 560,000 sheets and engage another vendor to finish the project, resulting in a direct loss to Plaintiff of more than $180,000.00."  Compl. ¶ 17.

[4]     Neither Plaintiff nor Defendant has grouped Plaintiff's claim in this manner.  Nonetheless, such a grouping best serves the Court's consideration of the matter.

Defendant has not produced sufficient evidence such that a
reasonable jury must find that it did "all that a reasonable
person could have been expected to do to avoid the [injuries to
Plaintiff]." Bowman, 179 A.2d at 202; see also Mouse's Case, 77
Eng. Rep. 1341. Most of Defendant's evidence goes towards
proving the power and unprecedented nature of Hurricane Sandy.
See Def.'s Mot. Summ. J., Ex. C-4, Tropical Cyclone Report
Hurricane Sandy, ECF No. 17-4 et seq.; Id., Ex. C-5, Service
Assessment, Hurricane/Post Tropical Cycle Sandy, ECF No. 17-8.
While these exhibits conclusively show that Sandy was the cause,
and that it was an unusually strong storm for that region, the
exhibits do not establish that Defendant could not have
undertaken some task to prevent, or at least mitigate, the
damage, particularly in light of Plaintiff's evidence that
Defendant had several days' warning, see, e.g., Public
Advisories Issued by the National Hurricane Center.

        Defendant's proofs focus on rebutting Plaintiff's
answers to Defendant's interrogatories in which Plaintiff
identifies several ways Defendant could have prevented or
mitigated the harm to Plaintiff's property. Def.'s Mem. Supp.
Mot. Summ. J 13-15. Those actions included, inter alia,
insuring Plaintiff's property for loss against flood, moving
Plaintiff's property off the floor and into racking, and moving
the material off site. See Def.'s Mem. Supp. Mot. Summ. J. 13-

15 (citing Pl.'s Resp. Def.'s Interrog. No. 24).  To rebut
Plaintiff's assertions, Defendant relies on its own answers to
interrogatories, the affidavit of Elliot Ward (president of
Defendant), photographs of the facility showing the water
damage, and the above-mentioned reports.

        This evidence, taken in the light most favorable to
Plaintiff as the non-moving party, is not enough to entitle
Defendant to summary judgment.  A reasonable jury could conclude
that, given the forecasts and predictions in the days leading up
to Hurricane Sandy's arrival, Defendant should have taken the
materials off site or that, despite the flooding which reached
forty inches in the facility, securing them at a higher level
could have prevented or mitigated the damage.  Thus, Defendant
has not established, as a matter of law, that the loss could not
have been "prevented by human care, skill or foresight," <u>Engle</u>,
598 A.2d at 300, or that "[D]efendant [did] all that a
reasonable person could have been expected to do to avoid the
happening which is the cause of [P]laintiff's injuries," <u>Bowman</u>,
179 A.2d at 202.[5]  Accordingly, Defendant is not entitled to
summary judgment on the first group of Plaintiff's alleged

_____

[5]        Defendant, in fact, acknowledges having done nothing
in respect to the storm to prevent or avoid Plaintiff's loss.
Def.'s Resp. Pl.'s Interrog. No. 16.  Defendant's sparse
evidence is not sufficient, as a matter of law, to establish
that there was no remedy which Defendant could have reasonably
employed to prevent or mitigate Plaintiff's loss.

damages (those that relate to the destruction of Plaintiff's approximately 560,000 sheets of paper and the cost of reprinting them).

As to the second group, while a jury might find that Defendant could have prevented the destruction of Plaintiff's property, there is no genuine dispute that, "as a result of the water damage, [Defendant] was shut down and unable to reopen for four months (February 2013).  In order to clean and rebuild its facility, and repair and order replacement equipment to restart its business, it was not until March 2013 that full operations resumed."  Def.'s Mot. Summ. J., Ex. C-1, Ward Aff. 4, ECF No. 17-1.  Even if Defendant had saved Plaintiff's 560,000 sheets from the flood, Defendant would not have been able to complete the project.  Plaintiff does not argue or submit any evidence to show that Defendant could have reasonably undertaken any steps such that it would have maintained the operating capacity to complete the binding, or could have come back into operation sooner than it did, for the benefit of Plaintiff.  Accordingly, because the act of God defense applies here, Defendant is entitled to summary judgment for the alleged damages which fall into the second group (damages allegedly related to engaging another vendor to complete the project) but not those falling into the first (damages related to the loss of the 560,000 sheets).

**VI.   CONCLUSION**

For the reasons set forth above, the Court will deny the Motion in part and grant the Motion in part.  Plaintiff may proceed to trial on its claims relating to the loss of the 560,000 sheets of paper and the costs of reprinting them.  Any claim for damages relating to engaging another vendor, however, is dismissed as the loss is due to an act of God.